# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00061-CV

**Robert T., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-FM-10-006141, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, Robert T., appeals from the trial court's order finding that termination of his parental rights was in the best interest of his child, R.T.[1]  Robert challenges the factual sufficiency of the evidence supporting the trial court's finding.  *See* Tex. Fam. Code Ann. § 161.001(2) (West Supp. 2012).  We will affirm the trial court's decision because we hold that the evidence is sufficient to support termination.

## BACKGROUND

R.T. is the daughter of Robert and Tameka H.  Tameka voluntarily relinquished her parental rights to R.T. before trial.  R.T. was almost four years old at the time of the termination trial.

---

[1] To preserve the parties' privacy, we identify the parents and other adult family members by first name and the children by initials.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8.

The Texas Department of Family and Protective Services (Department) first became involved with R.T. when Robert and Tameka were arrested for possession of crack cocaine in January 2008 when R.T. was approximately six weeks old. The police officer who made the arrest testified that R.T. and her older brother, J.H., were in the car's backseat at the time.[2] After his arrest, Robert admitted to the police officer that he had purchased two rocks of cocaine and had smoked one before getting into the car. At the termination trial, however, Robert testified that the cocaine was actually Tameka's and that he did not know it was in the car until the police officer began following them, and Tameka then told him. Robert testified that he admitted to the cocaine possession after his arrest because he was trying to protect Tameka. Both Robert and Tameka were imprisoned after their arrests. Robert was not released until April 2008; Tameka was released about a month earlier. While they were imprisoned, Robert's sister Bridgette cared for R.T., and his brother Larry cared for J.H.

A Child Protective Services (CPS) investigator had been assigned to the family's case, and after they were released from jail, CPS required that R.T. stay with Bridgette until Robert and Tameka had stable employment and housing and also required Robert and Tameka to submit to drug tests.[3] After Robert's release from jail in April 2008, the family (including R.T.) all stayed with his mom for about two months and then got an apartment in Luling, Texas, where they lived for approximately six months. They then moved to a house in Manor in early 2009 and lived there

---

[2] Robert's parental rights to J.H. were the subject of a separate case.

[3] Robert testified that he did not remember being asked to participate in CPS services. He recalled that Tameka was supposed to participate in some parenting and anger-management classes, as well as counseling, but he did not think she had gone more than one time.

together until later in 2009.[4]  At that time, Robert moved out of the Manor house and moved in with a cousin.  He testified that he moved out "because of altercations" between him and Tameka, during which Tameka would become aggressive with him and he would try to get away from her.  He left R.T. with Tameka and Tameka's other four children in Manor.

Robert testified that he and Tameka met in 2005 and that between 2005 and 2008 Tameka was not violent and did not use drugs.  He testified that after she began using drugs, there were several incidents of arguments between them during which Tameka would physically assault him and that he had to push Tameka away from him a couple of times to make her leave him alone because she would try to provoke him into fighting with her.  The most serious incidence of domestic violence occurred in April 2009 when Tameka and Robert argued while Tameka was driving.

Robert testified that Tameka hit him several times while she was still driving.  He grabbed her hand and folded it downward, and she stopped the truck in the road and they both got out.  Tameka was yelling at him and asking him for money.  After he gave her some money, he thought she was leaving, but she tried to back the truck up over him several times.  Another driver had called the police, and the police came shortly after Tameka had driven away.  The police interviewed Robert, but no one was ever arrested for the incident.[5]  Robert testified that he has never been arrested for family violence.

---

[4] Robert gave conflicting testimony about the date that he moved out.  He first stated that he moved out in September or October 2009, but later stated that he moved out after the April 2009 domestic-violence incident described in more detail below.

[5] There was only one other instance of domestic violence between Tameka and Robert that escalated enough for the police to become involved.  Robert testified that the police were called for a domestic-violence incident that occurred in Luling in November 2008.  The record does not indicate exactly what happened or whether Tameka was arrested or charged after this incident.

The CPS investigator, Sara Torres, who interviewed Tameka after the April 2009 incident, agreed that Tameka had admitted that she usually started the incidents and that Robert would also put his hands on her. Tameka also admitted to the investigator that these incidents sometimes happened in front of the children. CPS decided not to remove the children, but instead to establish a safety plan describing CPS's expectations of what Tameka and Robert would do to keep the children safe. Torres testified that she decided in this case that Robert should not have contact with the children, even though she had not yet met Robert. She determined after interviewing Tameka that Tameka and Robert were not a good combination around the children and the children seemed bonded with Tameka. Torres informed Robert of this decision by leaving him a telephone message and only briefly spoke with him after that. After establishing the safety plan, the Department transferred the case to its Family Based Safety Services (FBSS) program in May 2009 because CPS decided it would be appropriate to have the family participate in services, given the history of domestic violence, drug use, and concerns about Tameka's mental health. Since Tameka was cooperative about signing the safety plan, CPS believed the children were not in immediate danger.

When Robert went to the house on R.T.'s birthday in November 2009, Tameka was not there. One of her friends was with the children. Tameka called while he was there and told him that she had been arrested that day for smuggling marijuana over the border from Mexico. Robert stayed with the children. Robert testified that CPS called the house and came out to test Robert for drugs. He tested negative, so after CPS inspected the house, CPS allowed him to stay with the children. The family's FBSS caseworker, Ronnie Cauley, testified that after his home visit to the Manor house sometime in December 2009, CPS asked Robert to participate in services, including

4

parenting classes, a psychological evaluation, and individual counseling with a focus on anger management and protective parenting.

Robert testified that the family could not stay at the Manor house because Tameka had changed the lease on the house, and Robert was no longer on the lease. Instead, Robert moved with the children into his deceased mother's house in Luling soon after Tameka's arrest.[6] His cousin Austin also moved in with them to help him with the children while Robert was at work.

Robert testified that around February 2010 he asked his brother Larry whether R.T. and her brother J.H. could live with Larry and his wife until Robert was able to get the house in a more livable condition. There were a lot of boxes that needed to be cleaned out, and he also needed to do repair work on the plumbing system under the house. According to Robert, R.T. only stayed at Larry's house for about a week. After that, R.T. stayed with Robert's cousin's daughter, Valerie A., and her husband, Harry A. Valerie testified that she and her husband picked up R.T. from Larry's house and took her to their house on February 21, 2010. She testified that they took R.T. to help out Larry because it was difficult for Larry to manage two children on his income, and Larry had not heard from Robert since Robert left the children with him.

Although the Department was involved with R.T.'s case during this period, there was no court involvement and no visitation plan. Cauley testified that the lack of visitation plan became an issue because Robert would pick up R.T. whenever he wanted to and then bring her back to Valerie's whenever he wanted to, but R.T. needed the stability of a weekday routine. As a result, there was a family group conference in April 2010 with CPS at the home in Luling to discuss the

_____

[6] Robert's mother died in May 2009.

lack of stability that Robert was able to provide for R.T., the services that Robert needed to complete, and the need for a visitation plan.

At the April 2010 meeting, CPS and the family established a visitation schedule providing that Robert could take R.T. for weekend visits as long as he brought her back by 6:00 p.m. on Sunday nights. Cauley testified that after the conference Robert followed the schedule and usually brought R.T. back on time on Sundays, but he was not visiting her on a weekly basis because of his work schedule. Also, although Robert had begun parenting classes in March 2010 (after R.T. moved out), he had not attended twelve classes, which is the Department's requirement for successful completion. Cauley testified that after the April 2010 meeting, Robert completed six of the twelve parenting classes, had a psychological evaluation in July 2010, and started counseling sometime in September 2010.

Robert testified that during this time period (approximately April through September 2010), he lived in the home in Luling, and it was in good condition. Robert lost his job sometime around April 2010, and the electricity and water were cut off in the Luling home after that for at least a day or two sometime in July or August 2010. Robert was arrested in September 2010 for theft by check. The charge was later dropped, but he was in jail until early October 2010 because he was also held on a parole warrant. After that incident, he moved in with his sister Bridgette.

Cauley testified that another family group conference was held in November 2010 because the family was upset with Robert's lack of progress and wanted to move forward to provide stability for R.T. The group that met included Robert, Bridgette, Valerie, and CPS. Robert testified that Bridgette told him at that meeting that he was going to have to find someplace else to stay.

6

Shortly after that, on November 8, 2010, the Department petitioned for temporary managing conservatorship of R.T. and termination of Robert's parental rights to R.T.

On November 24, 2010, the trial court issued temporary orders and granted temporary managing conservatorship of R.T. to the Department. The trial court also ordered Robert to do the following: (1) secure and maintain safe, appropriate, drug-and-alcohol-free housing; (2) secure and maintain safe and appropriate employment and provide the Department with check stubs; (3) participate in protective-parenting classes, demonstrate appropriate parenting skills, and provide proof of completion to the Department; (4) participate in individual counseling to address the issue of domestic violence; (5) submit to random drug testing upon the Department's request; and (6) remain drug and alcohol free. The order notified Robert that his parental rights were subject to termination unless he was willing and able to provide R.T. with a safe environment within the reasonable amount of time set out in his service plan. The order also provided that the case would be dismissed by November 28, 2011, unless the trial court had rendered a final order by that date.

After the trial court granted temporary conservatorship to the Department, the case was transferred from FBSS to the conservatorship unit. The family's conservatorship caseworker, Roya Carver, testified that after the case was transferred to her she set up the court-ordered services for Robert. The trial court had approved the continuation of R.T.'s placement with Valerie and Harry and ordered that Robert would have visitation as agreed by Valerie and Harry. For the month of December the agreed visitation was for Robert to take R.T. for weekend visits and bring her back by 6:00 p.m. on Sundays.

Carver testified that Robert had a couple of visits with R.T. in December. The court held a status hearing in January 2011. The trial court continued its prior orders and also ordered Robert to provide the Department with a copy of his lease agreement. At this hearing, Robert's visitation with R.T. was changed to two hours once a week with all exchanges to occur at the Department's office. The trial court's order provided that the schedule would continue for one month and would be expanded by agreement of child advocates.

Carver testified that Robert attended four weekly counseling sessions in February 2011 and visited R.T. three times. Carver stated that at two visits a man that she did not know was in Robert's car and at one of the visits an unknown woman was also in the car. Robert brought R.T. back 45 minutes early from that visit. Carver also testified that Robert visited R.T. five times in March 2011, and a sixth visit was cancelled because Robert was more than twenty minutes late to the visit. The unknown woman who had been seen in Robert's car in February was with him again for one of the March visits. Carver also requested that Robert submit to a drug test on two occasions in March, and he failed to comply with that request. Although Robert testified that he never failed a drug test requested by CPS, the Department views a missed test as a failed test.[7] According to the Department, although Robert had some negative drug tests, in addition to failing to submit to the two requested drug tests in March 2011, he also missed a test once in May 2011. Carver did not have

___

[7] Robert's parole officer also testified that Robert was subject to random drug testing after being placed on parole in 2005, and he never failed a drug test in this parole. The parole officer testified that Robert tested negative on those random drug tests from 2005 to 2008 and did not miss any requested tests. Robert stopped reporting to his parole officer in February 2011, and in part, his failure to report resulted in his later being held for a revocation hearing after he was arrested for failure to identify.

8

information from Robert's counselor for March 2011, but Robert attended three of four sessions in April 2011. He also visited R.T. four times in April. In May 2011, he attended two out of five therapy sessions and had a visit with R.T. on May 4 that would ultimately be his last visit with her before trial.

Robert failed to appear for the permanency hearing held on May 9, 2011. Although he was arrested later that month, he had not been arrested by this date. The court orders remained the same as before, except that the visits were changed from two-hour unsupervised visits once a week to two-hour supervised visits at the Department once a week because of the child advocates' concerns about the unknown people Robert was bringing to visits and because the advocates did not know where he was taking her. Robert did not have another visit with R.T. after the new order, however, because he had been arrested for failure to identify and violation of his parole while doing security work in Seguin, Texas, and by May 25, he was in jail.

The court held another permanency hearing in August 2011 and kept the same orders in place. Robert had never provided the Department with proof of stable housing or employment or with proof of having taken twelve protective-parenting classes. He ultimately was unsuccessfully discharged from therapy because he was incarcerated. And although Robert could not visit R.T. because he continued to be incarcerated, Carver testified that he had not called R.T. or sent her letters since he had been in jail. At the time of the termination trial, Robert continued to be held on a motion to revoke his parole. The motion had been heard on November 10, 2011, a few days before the termination trial began. The Board of Pardons and Parole had not made its decision at the time

9

of trial, but the Department presented evidence that one possible outcome was that he could be incarcerated until February 17, 2013.[8]

After a three-day trial on the merits in November 2011, a jury found that the parent–child relationship between Robert and R.T. should be terminated. The trial court entered judgment terminating Robert's parental rights, and this appeal followed.

## STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). A termination decree permanently and irrevocably divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also* Tex. Fam. Code Ann. § 161.206(b) (West 2008). As a result, we strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in the parent's favor. *Holick*, 685 S.W.2d at 20-21.

"Termination [of parental rights] is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination of the parent–child relationship by proof more substantial than a preponderance of the evidence." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). Accordingly, the factfinder must find clear and convincing evidence that (1) the parent has

---

[8] The ultimate outcome of Robert's parole-revocation hearing is not part of the appellate record.

engaged in the conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see also* Tex. Fam. Code Ann. § 161.001 (codifying standard and establishing statutory grounds). "Clear and convincing evidence" means the measure or degree of proof that will produce in the factfinder's mind a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code Ann. § 101.007 (West 2008).

This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable-doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d at 847. The higher burden of proof in termination cases alters the appellate standard of factual-sufficiency review. *In re C.H.*, 89 S.W.3d at 25. "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* On appeal, we must review the entire record to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.*; *see also id.* at 28-29 (reversing appellate court's judgment that evidence was insufficient to support termination because appellate court disregarded much of evidence supporting best-interest finding).

In a factual-sufficiency review, we must give due consideration to evidence that the factfinder could have reasonably found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must analyze the conflicting evidence presented by the parties. If we determine that a factfinder could have reasonably resolved the conflict in support of the challenged finding, the evidence is factually sufficient. *See id.* On the other hand, if the evidence does not reasonably

support the finding and is so significant, considered in light of the entire record, that a factfinder could not have reasonably formed a firm belief or conviction about the truth of the State's allegations, then the evidence is factually insufficient to support the finding. *See id.* We defer to the factfinder's determination of issues related to witness credibility if its determination is reasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

## DISCUSSION

In this case, Robert concedes that the State established statutory grounds for termination by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (F), (N), (O). In his sole issue on appeal, Robert challenges the factual sufficiency of the evidence indicating that termination of his parental rights is in R.T.'s best interest. *See id.* § 161.001(2) (requiring best-interest finding to support termination order). Robert contends that the evidence is factually insufficient to support the best-interest finding in part because (1) he had contact with R.T. for much of her life, including over a year as her main caretaker, (2) the Department's arguments for termination were based on circumstances that arose largely because Robert was incarcerated for part of the case and thus unable to complete services, and (3) it was uncertain whether the Department's plan for R.T.'s adoptive placement with Valerie and Harry would succeed because of Harry's criminal history.

"While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent–child

12

relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26. There is a strong presumption that a child's best interest will be served by preserving the parent–child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)).

We consider a number of factors when assessing the best interest of the child. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (providing non-exhaustive list of pertinent factors). These factors include (1) the child's desires, (2) the child's present and future physical and emotional needs, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the person seeking custody, (5) the programs available to assist these individuals in promoting the child's best interest, (6) plans for the child by these individuals or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent–child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Id.*; *see also* Tex. Fam. Code Ann. § 263.307 (West 2008) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d at 27. No one factor is controlling, although the analysis of a single factor may be adequate in a particular factual situation to support a termination finding. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39. In addition, the absence of evidence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*,

89 S.W.3d at 27. On the other hand, even evidence of every *Holley* factor will not suffice to support a termination finding if the evidence is sparse. *Id.*

On appeal, Robert primarily focuses his argument on (1) his efforts to comply with the court order and the Department's service plan and (2) his concerns that Valerie and Harry will not allow him to have visitation with R.T. and that Valerie and Harry may not be able to adopt R.T. because of Harry's felony criminal history. We turn first to Robert's efforts to comply with the trial court's order and the Department's service plan.

**Compliance with the court order and the Department's service plan**

The evidence concerning Robert's compliance efforts implicates several *Holley* factors—his ability to provide for R.T.'s present and future physical and emotional needs, his parental abilities and the programs available to assist him, the stability of R.T.'s home, Robert's acts or omissions that may indicate the parent–child relationship is not appropriate, and his excuses for those acts or omissions. The Department presented evidence of Robert's inability to acquire stable housing, his failure to provide financial support for R.T. and proof of stable employment to the Department, his failure to complete the parenting services ordered by the trial court, and other parenting acts and omissions that indicate the parent–child relationship is not appropriate. Evidence contrary to the jury's verdict primarily consists of Robert's testimony about his love for R.T. and his reasons for failing to comply with the trial court's order and the Department's service plan. We examine the record to determine whether the jury reasonably resolved the conflicts in the evidence related to these issues. If it did not, we analyze whether the evidence that fails to reasonably support

14

the challenged finding is so significant in light of the entire record that the jury could not have reasonably formed a firm belief or conviction that termination was in R.T.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

### *No proof of stable housing*

The trial court had ordered Robert to obtain and maintain safe and appropriate housing when it granted the Department temporary managing conservatorship of R.T. in November 2010. The Department presented evidence that after more than a year Robert had not been able to acquire stable housing and that R.T.'s housing situation had been unstable from the time of her birth in November 2007 until she began living with Valerie and Harry in February 2010. In that time period, R.T. had moved at least six times.

At the time of trial, R.T. was nearly four years old. She had lived with Robert for only about eighteen months during the first twenty-six months of her life and had not lived with him at all between February 2010 and November 2011. Despite Robert's testimony that his mother's house was in livable condition during 2010, R.T. lived with Robert for only about three months (from mid-November 2009 until mid-February 2010) after Tameka's arrest. No evidence was presented about the stability or suitability of Robert's living situation between the time his sister Bridgette asked him to move out in November 2010 (shortly before the Department obtained temporary conservatorship of R.T. in November 2010 and continued her placement with Valerie and Harry) and his arrest and imprisonment in May 2011. Robert admitted at trial that if he was released from jail that day, he would have no place to take R.T.

15

*No proof of stable employment*

In addition to failing to acquire stable housing, Robert failed to provide pay stubs as proof of stable employment to the Department after the trial court ordered him to do so in November 2010. Robert testified that he had been intermittently employed by Fosho' Clothing since 2005 and that the company had told him that he would be rehired after his release from jail. However, his last full-time employment with Fosho' Clothing had been in April 2010. He also testified that he was unemployed at one time and at other times he worked as a security guard. Robert did not explain why he had not provided pay stubs to the Department or how he earned a living between his last full-time employment in April 2010 and when he was arrested in May 2011.

*No financial support for R.T.*

The Department elicited testimony from both Robert and Valerie that Robert never gave Valerie and Harry money for R.T.'s support. Robert also testified that he had obtained food-stamp benefits for R.T., but he had not shared those benefits with Valerie and Harry except by bringing them food. Robert testified that he gave Valerie approximately $75-$100 worth of food on a couple of occasions in October and November 2010, but he also testified that he kept R.T.'s food stamps after she was placed with Valerie because R.T.'s benefits were shown on the same card as his. He said that he gave the food to Valerie since he could not give her his card. Valerie testified that he gave her food twice—one time he gave her a box of stale cereal and a box of muffins and another time he brought some meat that had been thawed and was past its expiration date. Valerie testified that he never offered her any other food or other supplies, such as diapers.

16

Robert testified that his relationship with Valerie deteriorated approximately a month after R.T. had gone to live with her. He became angry because he would buy clothes for R.T. and send them to Valerie's house with R.T., but Valerie would send them back and tell him not to buy clothes for R.T. because she and Harry would do it. Also, he testified that Valerie would get angry with Robert because sometimes Robert would send new clothes back with R.T. and keep the clothes that she had been wearing when he picked her up to wash them. Valerie agreed that Robert had not been bringing back the clothes that she and Harry had purchased for R.T., but she testified that he never brought the clothes back even after she asked him to do so. She testified that because Robert had not been bringing back the clothes, she sent R.T. home with her old clothes that were too small and that was the occasion when Robert bought two outfits for R.T.

Although Robert did not provide financial support for R.T. except in early 2010 and she went to live with Valerie and Harry in February 2010, he testified that he claimed R.T. as a dependent on his income tax for six months of 2010. Valerie also claimed R.T. as a dependent on her income tax. She testified that her income tax was rejected because of Robert's claim of R.T. as a dependent on his taxes, which caused her to have to file additional paperwork to get credit for her claim.

*No completion of court-ordered services*

The Department presented evidence that FBSS cases typically stay open from three to six months, but this family's case had been open from May 2009 to November 2010 before the Department made the decision to file for temporary managing conservatorship of R.T. Cauley, the family's FBSS caseworker, testified that the Department asked Robert to begin participating in

17

services after Robert moved back in with the children after Tameka's arrest and Cauley made a home visit in December 2009. The services included a series of twelve parenting classes, a psychological evaluation, and individual counseling with a focus on anger management and protective parenting. Cauley testified that Robert had begun the parenting classes by March 2010 and ultimately completed six classes after April 2010, which is consistent with Robert's estimation that he started the classes four to five months after the Department asked him to participate in services. Cauley explained that the program consists of twelve classes with a certificate provided for each individual class and then another certificate given when the series is complete. The Department considers the parenting classes successfully completed only after the full series of twelve classes has been attended.

Robert testified that he had the psychological evaluation a couple of months after he started the parenting classes; Cauley testified that he completed the evaluation in July 2010. Robert testified that he began going to counseling about two weeks after he had the psychological evaluation, but Cauley testified that he started counseling sometime in September 2010. Robert testified that by the time he got out of jail in October 2010, he had completed his anger-management services and a parenting class, but no certificate had been provided to him for the anger-management services, and he still needed to complete the counseling.[9]

---

[9] Robert testified that he was also supposed to be going to a substance-abuse group as a condition of his parole, but that he was not doing it "because they told me to take care of my family first" after Tameka was arrested and R.T. was living with him.

Carver, who supervised Robert's participation in services after November 2010, acknowledged at trial that Robert had participated in counseling from February 2011 until he returned to prison in May 2011. She also testified that Robert's counselor reported that Robert was making progress and was working on anger management, as the Department had requested. But he was unsuccessfully discharged from therapy because he failed to attend while he was in jail. In addition, Robert never completed the required number of protective-parenting classes, provided proof of completion of the classes, or demonstrated appropriate parenting skills.

Cauley and Carver both testified that the purpose of the services is to actually address the problems that CPS identified in the investigation stage—attending classes alone is not sufficient to address the problems. In this case, the Department sought temporary managing conservatorship—and later termination—because Robert did not demonstrate progress in fixing the identified problems. He had no stable housing and provided no proof of employment. While he had participated in some of the requested or court-ordered services, he had not yet completed counseling or twelve parenting classes after almost two years of Department supervision (December 2009 until November 2011). Accordingly, Carver recommended termination of Robert's parental rights because of his failures to comply with the court order, complete his services and the requested drug tests, and comply with the terms of his parole. R.T.'s court-appointed guardian ad litem also recommended the termination of Robert's parental rights based on his lack of past ability to provide a stable home, his inability to demonstrate the potential for providing a stable home in the future, his "minimal at best" participation in services, and his inconsistent visitation with R.T.

*Other parenting acts and omissions*

The Department presented evidence of other parenting omissions by Robert. R.T. was not current on her immunizations when she first arrived in Valerie and Harry's home. Robert did not call R.T. on her third birthday, come to her birthday party at a local restaurant, or bring her a gift. He did not call or write to her after his May 2011 arrest.

Robert's own brother Larry testified that he believes that Robert's parental rights to R.T. should be terminated because even though he believes Robert tries to do the right thing, he also continues to make some mistakes. Larry believes that Valerie should have the opportunity to adopt R.T. The jury heard testimony from Larry that he had previously helped Robert care for Robert's now-adult first daughter when she was nine years old and that he was continuing to care for J.H. as of the time of trial.

*Evidence of excuses for Robert's acts and omissions*

The primary evidence contrary to the verdict consisted of Robert's testimony. Robert testified that he had a religious conversion experience during the time he was in jail in the late 1990s and became a changed man. He no longer smokes marijuana, uses other drugs, or drinks alcohol.

Robert testified that he waited so long to begin his participation in services because his job at the time was very hectic. Robert testified that the travel and hours required by his job with Fosho' Clothing made it difficult for him to complete his services because sometimes he was not finished with work by the time the classes started. However, he had also testified that his last full-time employment had been in April 2010, and he did not explain why he was unable to complete additional parenting classes after he lost his job. Robert stated that the parenting classes were three-

hour classes held two days a week, but he was able to attend only once a week. He also testified that he believed that he had complied with the requirement to complete six weeks of parenting classes. He further testified that from these classes and his counseling sessions he learned to be a better parent and to better control his emotions and anger. He testified about how much he loves R.T. and how protective of her he feels and asked the jury not to hold his past mistakes against him.

On appeal, Robert also argues that it became difficult for him to complete services because he was incarcerated for part of the case. Robert has been incarcerated or on parole for much of his adult life.[10] In 1997, after being convicted and placed on parole in 1996 for possession with intent to deliver cocaine, he again was convicted for possession of cocaine. His parole was revoked, and he served eight years and four months of his fifteen-year sentence. He was released in 2005, but remained on parole.

Robert testified that he had been arrested four times between R.T.'s birth and the time of trial beginning with his arrest for possession of cocaine in January 2008. Robert had been released on bond in April 2008 for the January 2008 possession charge. In 2009, he was arrested and held for four hours for the offense of failure to identify. In September 2010, he was arrested for theft by check.[11] He was also held on a parole warrant and spent about a month in jail. At the time of the

_____

[10] Robert turned 18 in 1983. He testified that his first criminal conviction as an adult was for accessory to robbery in 1985 for which he served two years. In 1989, while on probation for burglary of a vehicle, he was convicted of burglary of a habitation and served about 11 months of his five-year sentence. In 1990, he was convicted for possession of a controlled substance and served 11 months.

[11] The jury heard conflicting testimony about whether Robert was convicted on this charge. His parole officer testified that Robert had a conviction of theft by check in September 2010, but that it was determined that he could continue on parole after that offense. Robert testified that the charges were dismissed because someone else wrote a check in his name.

trial, Robert had been incarcerated since May 29, 2011. He was arrested on that date for failure to identify himself and for violation of parole, when he was in Seguin doing security work. He was also held on the open warrant for his arrest related to the 2008 possession charge. In October 2011, he was sentenced to 365 days on the 2008 possession charge, including time already served.

At the time of the termination trial, Robert was also being held on a motion to revoke his parole as a result of an accumulation of technical violations, including failing to report to his parole officer, and the new criminal offenses detailed above. The motion had been heard a few days before the termination trial began, and no decision had been made by the time of trial. The Department presented evidence that one possible outcome was that Robert could be incarcerated until February 17, 2013, and even if he were not incarcerated for that full length of time, he would remain on parole until that date.

The jury could have reasonably found some of Robert's testimony disputing whether termination was in R.T.'s best interest to be clear and convincing evidence *supporting* termination. For example, although Robert testified that he is a changed man, he nevertheless has been on parole for R.T.'s entire life and has spent a substantial amount of that time in jail. While imprisonment alone does not support an inference that a parent's conduct endangered the child, it can show a pattern of conduct that has the effect of endangering the child's well-being, which is relevant to the best-interest determination. *Trevino v. Texas Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 247-48 (Tex. App.—Austin 1995, no writ). The evidence shows that Robert was on parole when R.T. was born, committed a significant crime after R.T.'s birth, and has continued to offend and commit violations of his parole, resulting in his incarceration at the time of the termination trial with the possibility that he would remain incarcerated until February 2013. A factfinder may infer

that past conduct endangering a child's well-being may recur in the future if the child is returned to the parent. *In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39 *and In re C.H.*, 89 S.W.3d at 26. Robert's criminal conduct and imprisonment are relevant to several *Holley* factors, including the present and future emotional and physical danger to R.T., Robert's parental ability, the stability of R.T.'s home, and Robert's acts or omissions which may indicate that the existing parent–child relationship is not appropriate. *See Trevino*, 893 S.W.2d at 248.

The remaining evidence that Robert presented disputing the best-interest finding consisted of his excuses for not completing services because he was working, his testimony that he believed the six parenting classes he completed were enough to satisfy the court order, his assurances that he is a changed man, and his expressions of love for R.T. The jury could have reasonably resolved credibility issues to support its best-interest finding. *See In re J.P.B.*, 180 S.W.3d at 573. The jury also could have reasonably determined that over the prior two-year period Robert had not shown sufficient progress in his ability to provide a stable home environment or demonstrated appropriate parenting skills. We conclude that a factfinder could have reasonably resolved all of the disputed evidence in favor of the best-interest finding. *See In re J.F.C.*, 96 S.W.3d at 266.

**Concerns about potential adoptive placement**

Robert's remaining arguments concern the Department's plan for R.T.'s adoption by Valerie and Harry, R.T.'s need for permanence, and whether her placement with Valerie and Harry will satisfy her present and future physical and emotional needs. When we analyze a child's present and future emotional and physical needs, the need for permanence is the paramount consideration.

23

*See Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ) ("The goal of establishing a stable, permanent home for a child is a compelling interest of the government."). We must focus on the best interest of the child, not the best interest of the parent. *See id.* at 86. Parental rights may not be terminated merely because a child might be better off living elsewhere. *See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Nevertheless, a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered. *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39.

Robert testified that he did not want Valerie to adopt R.T. because Valerie had lied about events (including R.T.'s behavioral issues and the issues over R.T.'s clothes) and about him to get her way, and she had tried to cause problems between him and her husband Harry. He testified that he believed Valerie only kept R.T. to get whatever benefits she could get in terms of schooling, food stamps, and money and that she does not otherwise care about R.T. Robert argues on appeal that it was not in R.T.'s best interest for his parental rights to be terminated because of his concern that Valerie and Harry may be rejected as adoptive parents because of Harry's felony conviction. He contends that the possibility that R.T. might then become a ward of the State weighs against termination of his parental rights. Robert also argues that his difficult relationship with Valerie and Harry makes it unlikely that they would allow him to have visitation with R.T. in the future.

The Department presented evidence about the stability of R.T.'s placement with Valerie and Harry, as well as evidence related to its plan for R.T. to be adopted by Valerie and Harry.

Valerie and Harry voluntarily took R.T. into their home for months when Robert needed a place for her to stay while he worked on the Luling home. They continued to care for her after the Department was granted temporary managing conservatorship. Cauley, the family's FBSS caseworker, testified that he visited R.T. at Valerie and Harry's home once a month beginning in March 2010. He described the two-story home as very neat, clean, and "kid friendly." R.T. had her own toys, and she shared a room with Valerie's daughter. Cauley had no safety concerns about the home. He testified that R.T. was talking more and learning to count, and she had developed a bond to Valerie, Harry, and their two children, who were ages fourteen and twelve at the time of trial. R.T.'s court-appointed guardian ad litem similarly testified that during monthly visits to Valerie and Harry's home she observed that R.T. was a part of the family and was doted on by all the family members, including the older children in the home. The guardian ad litem had no safety concerns about the home and testified that there was adequate space, food, and clothing for R.T. The guardian ad litem's recommendation to the trial court was that Robert's parental rights be terminated so that Valerie and Harry could proceed with adoption.

Valerie also testified that R.T. had bonded with Valerie, Harry, and their children. R.T. is comfortable in her and Harry's home and has developed a good routine. Valerie testified that she, Harry, and their children treat R.T. as part of their immediate family and that she is always included in their plans. The jury also heard testimony from Valerie that R.T. had certain behavioral issues when she came into their home, including nightmares, bedwetting, and fear of policemen, but those issues had been resolved by the time of trial. Valerie also took care of getting R.T.'s immunizations up to date because they were not current when R.T. came into her care. Valerie testified that despite some conflicts with Robert's sister Bridgette, who had kept R.T. for the first

25

few months of her life, they had worked out visitation so that Bridgette can attend family functions or come to their house to visit R.T. Valerie stated that she respects R.T.'s roots and tries to honor R.T.'s bond to her mother and father by keeping a picture of them in R.T.'s room. She also has told R.T. that Robert is out of town, not that he is in prison. Valerie testified that the whole family wants to adopt R.T. She also explained her plan to continue providing R.T. with a consistent schedule and stability as well as a loving home.

Valerie addressed Robert's allegations that she was only keeping R.T. as a means of obtaining government benefits. She testified that the only monetary benefits that she and Harry had received for keeping R.T. were a one-time Temporary Assistance for Needy Families payment of $1,000 and two vouchers for clothing from the Department of approximately $100 each.[12] She also testified that this money had not been enough to pay all of the expense of caring for R.T. Valerie and Harry pay Valerie's mother to care for R.T. during the day when they are working, but they do not receive money from the Department or any other source to pay Valerie's mother. Valerie further testified that she has never received food stamps on R.T.'s behalf.

Both Valerie and Harry have stable employment. At the time of the termination trial, Valerie had been a teacher's assistant teaching special-needs children for seven years in the same school district. Valerie testified about Harry's conviction and explained that it occurred when he was almost eighteen years old. She stated that he was released from prison in October 1998 after serving almost five years, and he then successfully completed a seven-year parole. Valerie testified that

---

[12] Carver, the Department's conservatorship caseworker, corroborated that Valerie and Harry did not receive any utility or other bill payments from the Department and that the one-time payment of $1,000 that they received was through the Temporary Assistance for Needy Families program.

after Harry was released from prison he had worked his way up from clerk to manager to supervisor for a chain of convenience stores. As of the time of trial, he had been a supervisor for four years, supervising between nine and eleven stores. Valerie also testified that Harry is an active father who attends all of the children's sports practices and games, and he volunteers as a coach. Their children both participate in sports and other school activities and are on the honor roll at school. Carver, the Department's conservatorship caseworker, similarly testified that she has observed the quality of Harry's parenting and that he is very involved with his children and his actions show that he loves and cares about them.

Cauley and R.T.'s guardian ad litem both testified about the Department's policy for placement in a home in which someone has a felony conviction. The Department considers how long ago the conviction occurred, and for federal felony convictions, there is a five-year bar. The Department also conducts a risk assessment and analyzes how the person has progressed. Both Cauley and the guardian ad litem testified that a felony conviction is not necessarily a bar to placement. A risk assessment had been done before the original home study and court approval of R.T.'s temporary placement with Valerie and Harry, but an adoptive home study cannot be done before termination of parental rights occurs. Carver testified that she did not believe, based on her knowledge and experience, that there would be a problem in this case that would prevent Valerie and Harry from adopting R.T.

Although Robert testified that he loved his daughter and wanted to provide a stable home for her after he got out of jail, other evidence showed that over the prior two-year period he failed to establish stable employment and a stable home, he failed to cooperate with the Department to complete services to comply with the trial court's order, and he repeatedly continued to commit

27

parole violations resulting in arrest and jail time. The record also showed that R.T. had bonded with Valerie, Harry, and their children; that Valerie and Harry wanted to adopt R.T.; and that the Department did not foresee Harry's past felony conviction as being a bar to adoption. In light of this evidence, the jury could have reasonably formed a firm conviction that termination of Robert's parental rights was in R.T.'s best interest. As a result, we conclude that the evidence is factually sufficient to support the jury's best-interest finding and overrule Robert's sole issue on appeal.

## CONCLUSION

Having concluded that the evidence is factually sufficient to support the jury's finding, we affirm the trial court's order terminating the parent–child relationship.

_____

David Puryear, Justice

Before Justices Puryear, Goodwin and Field

Affirmed

Filed:   March 1, 2013

28